IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rossy Gavilanes, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>- against -<br><br>Gerber Products Company,<br><br>      Defendant | 1:20-cv-05558-FB-RER<br><br>First Amended Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1. Gerber Products Company ("defendant") manufactures, markets and sells milk-based powder with iron ("infant formula") to non-infants, designated as Gerber Good Start Grow ("Product").

I.  Misleading Representations that Gerber Good Start Grow is Nutritionally Appropriate

2. The American Academy of Pediatrics (AAP) recommends "exclusive breastfeeding for the first 6 months of life with the addition of complementary foods and the continuation of breastfeeding until at least 12 months of age."[1]

3. Infant formula with added iron is the accepted alternative where breastfeeding is not an option. 21 C.F.R. § 106.3 (defining infant formula as "a food which purports to be or is represented for special dietary use for infants [0-12 months] by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk.").

4. The transition beyond the first twelve months is "critical for establishing healthy

---

[1] *Id.*

dietary preferences and preventing obesity in children."[2]

5.  Defendant's Good Start Grow, marketed for children between twelve and twenty-four months old, recognizes the importance of this period in early development.

**Nourishing toddler tummies.**

The first 18 months are the most crucial time for your little one's belly. Gerber Good Start Grow has probiotics to help support your toddler's digestive health, as well as 2'-FL Human Milk Oligosaccharide. HMO is a prebiotic just like one of those found at significant levels in breastmilk.

**The goodness inside.**

Most toddlers aren't getting the recommended amount of certain key nutrients. That's why Gerber Good Start Grow is designed with essential nutrients, like vitamins D and E, to help fill common nutrient gaps, and has DHA and iron to support brain development.



6.  The formula trade group, Infant Nutrition Council of America, which includes the manufacture of Gerber Good Start Grow, stated that "transition formulas" can be used to fill nutrition gaps beyond 12 months.[3]

---

[2] Jennifer L. Harris, and Jennifer L. Pomeranz, "Infant formula and toddler milk marketing: opportunities to address harmful practices and improve young children's diets." Nutrition Reviews (2020).
[3] Olga Khazan, The Ominous Rise of Toddler Milk, Baby-formula sales are slumping, so the companies that make it have turned to supplements for 3-year-olds, December 29, 2020.

7. However, a global consensus of pediatric health organizations, including the American Academy of Pediatrics (AAP) Committee on Nutrition and the relevant Sub-Committee of the World Health Organization (WHO) reached the opposite conclusion.

8. These groups advise that beyond twelve months, children's nutritional needs should be met with whole cow's milk, water and healthy whole foods as part of a balanced diet, and that transition formula "is not recommended."[4]

II. Defendant's Good Start Grow is Identical to its Infant Formula Even Though it is Not Recommended for Dietary Needs of Target Group

9. Since 2003, rates of breastfeeding have increased significantly, resulting in a decrease in sales of infant formula.

10. To make up for declining sales of infant formulas, companies have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks," and "growing-up milks" ("GUMs") (collectively, "Transition Formulas") to children between twelve and thirty-six months old.[5]

11. U.S. Nielsen data shows advertising spending on transition formula quadrupled between 2003 and 2015, with sales increasing almost threefold.

12. Companies like defendant capitalize on consumers' familiarity and acceptance of federally approved infant formula and continue selling it to them when their children are no longer infants, defined as zero to twelve months old.

---

[4] AAP Committee on Nutrition, 1988. Follow-on formulas follow-up or weaning formulas. Pediatrics 83, 1067 1989; World Health Organization, July 17, 2013. Information concerning the use and marketing of follow-up formula.
[5] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16 (citing American Academy of Pediatrics (AAP) Committee on Nutrition and World Health Organization (WHO) findings).

13. Defendant's Good Start Gentle Pro Infant Formula (left) is advertised and marketed in a way that is near-identical to its Good Start Grow "Toddler Drink" ("transition formula"), through common labeling formats, images, design, type size, fonts, call-outs and graphics.



14. New York State regulations, identical to those of the Food and Drug Administration ("FDA"), require companies to identify and describe a product in a way that distinguishes it from other products. See 1 NYCRR 259.1(a)(3) contained in Section 259.1 ("Packaging and labeling of food.") (incorporating 21 C.F.R. § 102.5(a) which requires food and beverages have a distinct "common or usual name").

15. The Infant Formula and Toddler Drink have identical statements of identity: "Milk Based Powder."

      Infant Formula with Iron                        Transition Formula

 

16. The identical statement of identity for the Toddler Drink fails to indicate how it is different from the Infant Formula.

17. This harms consumers purchasing these items for their children, because the nutritional requirements of infants are different from children between twelve and twenty-four months.

18. The similarity and congruity of the representations continues:

| Infant Formula | Toddler Drink |
|---|---|
| 0 – 12 Months | 12 – 24 Months |
| For complete nutrition & advanced comfort | Tailored nutrition for toddlers |
| Everyday Probiotics; | Everyday Probiotics; |
| Digestive Health & immune support | Digestive Health & immune support |
| Brain & eye development; DHA | Brain development; DHA & Iron |
|  | Strong bones & teeth; Calcium & Vitamin D |
| Easy to digest – Comfort Proteins |  |
| 2' – FL; HMO Immune Support | 2' – FL; HMO Immune Support |

19. Through the similar representations, caregivers get the incorrect impression that the Gerber Good Start Grow Toddler Drink is the "next step" for children beyond infancy.

5

20. The identical labeling elements further this impression and ride the coattails of the carefully regulated infant formula products to drive sales.

III. Gerber Good Start Grow Toddler Drink is Nutritionally Inconsistent with Expert Advice

21. Child nutrition experts universally oppose consumption of added sugars by children between twelve and twenty-four months.

22. However, Gerber Good Start Grow Toddler Drink contains 15 grams of added sugar, shown on the Nutrition Facts.

**Nutrition Facts**
About 24 servings per container
Serving size: 3 scoops (28g)
Makes approx. 7 fl oz (200 mL)

Amount per serving
**Calories 130**

| | % Daily Value† |
|---|---|
| **Total Fat** 5g | 13% |
| Saturated Fat 1g | 10% |
| *Trans* Fat 0g | |
| **Cholesterol** Less than 5mg | 2% |
| **Sodium** 50mg | 3% |
| **Total Carbohydrate** 17g | 11% |
| Dietary Fiber 0g | 0% |
| Total Sugars 16g | |
| Includes 15g Added Sugars | 60% |
| **Protein** 4g | 31% |

6

23. The added sugars are identified in the fine print of the ingredient list as "Corn Maltodextrin" (corn syrup) and "Sugar."

**INGREDIENTS:** NONFAT DRY MILK, CORN MALTODEXTRIN, VEGETABLE OILS (HIGH-OLEIC SAFFLOWER, SOY, PALM OLEIN, AND COCONUT), SUGAR, AND LESS THAN 2% OF: POTASSIUM PHOSPHATE, CALCIUM PHOSPHATE, SOY LECITHIN, CALCIUM CITRATE, POTASSIUM CITRATE, CALCIUM CHLORIDE, MAGNESIUM PHOSPHATE, CHOLINE BITARTRATE, M. ALPINA OIL*, C. COHNII OIL**, SODIUM ASCORBATE, FERROUS SULFATE, B. LACTIS CULTURES, MIXED TOCOPHEROLS, ASCORBYL PALMITATE, ALPHA-TOCOPHERYL ACETATE, ZINC SULFATE, NIACINAMIDE, CALCIUM PANTOTHENATE, RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, VITAMIN A ACETATE, THIAMINE MONONITRATE, MANGANESE SULFATE, FOLIC ACID, BIOTIN, VITAMIN D3.

24. Even if caregivers scrutinize the packaging and discover the added sugars, they are not told that giving foods to children over twelve months with added sugars is inconsistent and contrary to their nutritional needs.[6]

25. Beyond containing added sugars, Good Start Grow contains less protein, equivalent calories and almost fifty percent more carbohydrates (sugars) than whole cow's milk.

---

[6] Maria J Romo-Palafox and JL Pomeranz et al., "Infant formula and toddler milk marketing and caregiver's provision to young children," Journal of Maternal and Child Nutrition, vol. 16,3 (2020): e12962. doi:10.1111/mcn.12962

7

**Nutritional Composition for 8 fl. oz.**

| Nutrient | Unit | Whole Cow's Milk | Gerber Good Start Grow Stage 3 |
|---|---|---|---|
| Energy | cal | 149 | 149 |
| Protein | g | 7.69 | 4.57 |
| Total Fat | g | 7.98 | 5.71 |
| Carbohydrate | g | 12.8 | 18.3 |

26. According to the price of the Product on third-party websites, the Product costs $17.48 per 680 grams.

27. According to the Retail Milk Prices Report of the United States Department of Agriculture, whole milk in New York City costs $3.85 per gallon as of May 2020.[7]

28. This means the Gerber Good Start Grow Stage 3 is almost four times the cost of the recommended alternative and nutritionally superior choice of whole cow's milk.[8]

| Price | Cow's (whole) | Gerber Good Start Grow Stage 3 |
|---|---|---|
| Price ($/100 g) | 0.15 | 0.59 |
| Price ($/8 fl oz) | 0.29 | 1.17 |
| Price ($/gallon) | 4.68 | 18.76 |

29. The similar labeling of the Infant Formula and Good Start Grow causes caregivers, like Plaintiff, to make inaccurate and ill-advised nutritional purchasing decisions.

30. For instance, a study of caregivers' understanding of transition formula labeling

---

[7] Agriculture Marketing Service, Retail Milk Prices Report, May 2020.
[8] Consensus Statement, Healthy Beverage Consumption in Early Childhood: Recommendations from Key National Health and Nutrition Organizations, Robert Wood Johnson Foundation, Healthy Eating Research, Sept. 2019.

concluded that 52% expected these products to "give toddlers nutrition that they wouldn't get from other sources."[9]

31. Public health research has shown that use of products such as Good Start Grow results in prolonged use of expensive, re-branded, infant formula instead of transitioning infants to cow's milk, water and other healthy foods.

32. 70% of persons surveyed believed transition formulas like Good Start Grow is a suitable drink for children in this age range, despite expert opinions that they offer "no unique nutritional value beyond what could be achieved through a nutritionally adequate diet; furthermore, they contribute added sugars to diet."[10]

IV. Misleading Representations as to GMOs

33. In recent years, consumers have become significantly more aware of, and sensitive to, products that have been approved by independent third parties, and they buy those products based upon the seals of the independent third parties.

34. Consumers have become significantly more aware of, and sensitive to, genetically modified organisms ("GMOs") in their food.

35. This is especially important when providing nutrition to small children.

36. Many consumers try to avoid GMOs for reasons including negative health and environmental impact.

37. As a result, many consumers try to buy products that are not derived from GMOs, and a movement has developed demanding consumer products that have non-GMO ingredients.

38. To meet consumers' demand for non-GMO products, an industry of independent,

---

[9] Maria J Romo-Palafox and JL Pomeranz et al., Marketing claims on infant formula and toddler milk packages: What do caregivers think they mean? , UCONN Rudd Center for Food Policy & Obesity, September 2019.
[10] *Id.*

9

third-party validation companies has developed.

39. These independent companies review the ingredients in products and assure consumers with their seal that the products do not contain GMOs and do not come from animals fed GMO food.

40. Thus, obtaining the approval from an independent third party allows companies to obtain an advantage in the marketplace over their competitors, to sell more products and charge higher prices.

41. Recognizing the value of independent certification, the Federal Trade Commission ("FTC") has warned companies to be careful in making representations about independent certification. See 16 C.F.R. § 260.1.

42. The FTC guidelines against deceptive marketing regarding "Certifications and Seals of Approval" state:

> It is deceptive to misrepresent, directly or by implication, that a product, package, or service has been endorsed or certified by an independent third party.

16 C.F.R. § 260.6(a) (emphasis added).

43. In violation of these principles, defendant represents the Product as verified by an independent third-party with respect to GMOs through the front and side panel "seal," which states, "Non GMO – Not Made With Genetically Engineered Ingredients."





44. In developing their "Non GMO" seal, defendant intentionally mimicked the content and appearance of the foremost independent verification organization – the Non-GMO Project.



45. The Non-GMO Project, headquartered in Bellingham, Washington, is a not-for-profit organization founded in 2007 that bases its work upon "rigorous scientific foundation and world-class technical support."[11]

46. Through the Non-GMO Project's work with the Global ID Group, these entities are "the world leaders in non-GMO testing, certification, and consulting."

47. The Non-GMO Project's Product Verification Program is widely recognized and has more than 3,000 verified brands, representing over 43,000 products and more than $19.2 billion in

---

[11] History, Non-GMO Project.

annual sales.

48. The Non-GMO Product Verification Program verifies that products are not derived from GMO crops and verifies that milk and meat are not derived from animals that were fed GMO crops.

49. Seals are distinguishable to consumers because they are written in a typeface and font wholly different from the surrounding text.

50. At first glance, defendant's "NON GMO" seal appears to be from a third-party, as its font and style contrast with that used elsewhere on the Product.

51. Unfortunately for consumers, the "Non GMO" seal is false and misleading.

52. The truth is that the "Non GMO" seal is not a designation bestowed by a non-profit, or even a neutral third-party, but instead is the work of defendant.

53. Looking to profit off consumer desire for independently validated products, Defendant created a deceptive Non GMO Ingredients Seal of approval label that mimics the Non-GMO Project seal and fails to tell consumers the whole truth about GMOs in the Product.

54. Defendant's seal tells a "half-truth": while the Product may not be *made with* genetically engineered ingredients, GMOs were used only one level back in the food production process.

55. For example, the Product contains dairy ingredients including milk and lactose, that come from cows fed GMO grains.

56. Therefore, the ingredients in the Product are derived from GMOs even though the Product may not be made directly with GMO ingredients.

57. This violates the standard of the Non-GMO Project, which prohibits its seal of on

12

dairy-based products that could be from animals fed GMO feed.[12]

58.     Defendant avoids the Non-GMO Project's feed standard by using their own, self-created Non GMO Ingredients Seal, thereby creating confusion and deceiving consumers.

59.     Defendant relies on consumer familiarity and trust of the seal of the Non-GMO Project and does not expect them to realize there is a difference.

60.     As a result of this deceptive seal, consumers paid a premium to purchase the non-GMO Product to avoid the well-known health and environmental risks associated with GMO products.

V.  Conclusion

61.     Defendant misrepresented the Product through affirmative statements, half-truths, and omissions.

62.     Defendant sold more of the Product and at a higher prices than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

63.     Had Plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

64.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than the Product costs $17.48 per 680 grams, excluding tax, compared to other similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

---

[12] *Animal-Derived Ingredients*, Non-GMO Project.

Jurisdiction and Venue

65. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

66. Plaintiff Rossy Gavilanes is a citizen of New York.

67. Defendant Gerber Products Company is a Michigan agricultural cooperative corporation with a principal place of business in Arlington, Arlington County, Virginia.

68. Diversity exists because plaintiff Rossy Gavilanes and defendant are citizens of different states.

69. Upon information and belief, sales of the Product and any available statutory and other monetary damages, exceed $5 million during the applicable statutes of limitations, exclusive of interest and costs.

70. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred here – the purchase of plaintiff and her experiences identified here.

Parties

71. Plaintiff Rossy Gavilanes is a citizen of Flushing, Queens County, New York.

72. Defendant Gerber Products Company is a Michigan corporation with a principal place of business in Arlington, Virginia, Arlington County.

73. Defendant is synonymous with baby food, and the largest, most respected company which purports to provide nutrition to young and growing children.

74. Plaintiff purchased the Product on at least one occasions within the statutes of limitations for each cause of action, or around August 2020, through Amazon.com and/or other locations.

75. Plaintiff bought the Product because she wanted a food which was nutritionally

adequate for a child between twelve and twenty-four months, as she was entrusted with a legally required duty to care for such a child.

76. Plaintiff did not expect the Product was of the type which global health bodies have criticized and condemned for the reasons herein.

77. The Product was worth less than what Plaintiff and consumers paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

78. Plaintiff paid more for the Product than she would have paid otherwise.

79. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's representations about its adequacy, components and ingredients are consistent with its representations.

## Class Allegations

80. The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations who purchased the Product for a child between twelve and twenty-four months old.

81. Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

82. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

83. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

84. Plaintiff is an adequate representative because her interests do not conflict with other members.

85. No individual inquiry is necessary since the focus is only on defendant's practices

and the class is definable and ascertainable.

86. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

87. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

88. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

(Consumer Protection Statute)

89. Plaintiff incorporates by reference all preceding paragraphs.

90. Plaintiff and class members desired to purchase a product which was nutritionally appropriate for a child between twelve and twenty-four months.

91. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

92. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

93. Plaintiff relied on the representations.

94. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty,
Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

95. The Product was manufactured, labeled and sold by defendant and expressly and impliedly warranted to plaintiff and class members that it possessed functional, nutritional, organoleptic, sensory and/or qualitative attributes which it did not.

16

96. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

97. This duty is based on Defendant's outsized role in the market for this type of Product – the most well-known baby food company, famous for its "Gerber Babies."

98. Defendant had a special duty to plaintiff because it capitalized on its reputation in the field of infant formula, a highly regulated product, to drive sales in an unregulated area.

99. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

100. Defendant received notice and should have been aware of these issues due to complaints by regulators, academics, competitors, and consumers, to its main offices over the past several years.

101. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

102. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

103. Defendant had a duty to truthfully represent the Product, which it breached.

104. This duty is based on defendant's position, holding itself out as having special knowledge and experience in field of baby and infant formula products.

105. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant.

106. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and

omissions, which served to induce and did induce, their purchases of the Product.

107. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

108. Defendant misrepresented and/or omitted the attributes and qualities of the Product.

109. Defendant's fraudulent intent is evinced by careful labeling to make it appear that the Gerber Good Start Grow was a product line "extension" of its infant formula product, and shared attributes such as its approval by federal regulators for the needs of the age group it was marketed towards.

### Unjust Enrichment

110. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and

interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: April 29, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com